## RAY WEINER, LLC *v.* W. HUDSON CONNERY, JR., ET AL.
### (AC 34799)

Lavine, Keller and Harper, Js.

Argued May 21—officially released September 24, 2013

*Daniel Shepro*, for the appellant (plaintiff).

*James J. Nugent*, with whom was *Julia A. Nugent*, for the appellees (defendants).

*Opinion*

HARPER, J. The plaintiff, Ray Weiner, LLC, doing business as All Phase Construction, appeals from the

judgment of the trial court in favor of the defendants W. Hudson Connery, Jr., and Ann Moore[1] on each count of the plaintiff's complaint and each count of the defendants' counterclaim in the total amount of $145,773.44. On appeal, the plaintiff claims that the trial court erred (1) in using an incorrect measure of damages, (2) in finding defects attributable to the plaintiff, and (3) in determining that the plaintiff was a general contractor for purposes of the Home Improvement Act (act), General Statutes § 20-418 et seq. We affirm the judgment of the trial court.

The following facts and procedural history, as set forth by the trial court and established from the record, are relevant to our resolution of this appeal. The plaintiff is engaged in the construction of residential and commercial properties. In April, 2006, Moore and the plaintiff entered into an agreement for the renovation and expansion of an existing single-family residence owned by the defendants and located at 11 Soundview Place in Milford.[2] Moore hired James McElroy, an architect, to draw up plans to renovate the house and construct an addition. The agreement between Moore and the plaintiff indicated that, with respect to the McElroy plans, the plaintiff would provide supervision of site work, excavation, concrete, exterior sheathing, house wrap, exterior trim including rakes, fascia board, crown molding and soffit board, framing, window installation, electrical, mechanical, masonry, roofing, insulation, dry wall and taping of three coats ready for painting and to provide site protection and shoring to keep all existing conditions free from damage due to weather.

---

[1] After the trial court rendered judgment, Arthur John May III, executor of Moore's estate, was substituted as a party defendant for Moore. Subsequently, Elizabeth Gieske, successor executrix of Moore's estate, was substituted as a party defendant for May.

[2] Although Connery was an owner of the residence, he did not sign the contract.

The guaranteed maximum price for the project was $284,654.60, including costs of $249,686, profit and overhead of $24,968.60, and contingency of $10,000. It was understood and agreed that work change orders properly submitted and approved could change the ultimate cost of the project. Proposed work change orders were to be submitted by the project manager, Robin McCready. The defendants had an open book right to see all invoices and moneys charged by subcontractors and suppliers regarding both contract work and change order work. The plaintiff was required to maintain a daily project log containing a record of the weather, subcontractors working on the site, number of workers, work accomplished, problems encountered and other similar relevant data. The plaintiff also was required to provide monthly written reports to the defendants and architect on the progress of the entire work.

Work began in the fall of 2006 and continued into 2007. The defendants approved and signed various change orders and paid invoices as they were submitted and periodically asked McCready for an accounting of project manager hours, subcontractor billing and how deposit moneys were being used. In early 2007, the defendants were concerned about the progress of the job and the quality of the work that had been done up to that time. They consulted the Roger Ferris architectural firm (Roger Ferris) with the intent of making changes to the house as set out in the McElroy plans. Rob Marx, an architect with Roger Ferris, became the architect on the project and, due to structural concerns, he advised the defendants to hire Ken Jones, a structural engineer, to review the project. After a meeting between Marx, Moore and McCready, changes were made to the original McElroy plans wherein Moore was charged a drafting fee for the changes. The parties disputed the amount of work that had been completed up to this time and the extent to which changes to the project

required the plaintiff to redo work that already had been completed. The parties also disputed the quality of the work that had been completed. Ultimately, after a change order was submitted by the plaintiff in excess of $600,000, the plaintiff was discharged by the defendants in May, 2007.

On August 6, 2007, the plaintiff filed a mechanic's lien on the subject property in the amount of $117,154. On July 17, 2008, the plaintiff filed a complaint seeking, inter alia, foreclosure of the mechanic's lien. The lien was released by the plaintiff on June 5, 2009, and an escrow account in the amount of $45,000 was created in order for the defendants to obtain refinancing. The plaintiff filed an amended four count complaint seeking distribution of the escrowed proceeds and alleging claims for breach of contract, unjust enrichment and quantum meruit. The defendants filed an answer denying the plaintiff's claims and setting forth a number of special defenses, most notably, that the plaintiff failed to comply with the provisions of the act. The defendants also filed a six count counterclaim alleging breach of contract, negligence, negligent hiring and supervision of subcontractors, violations of the act, and two theories of violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. The plaintiff filed a response denying the defendants' counterclaim. A trial was held from April 26, 2011 through May 19, 2011.

In its memorandum of decision, the trial court concluded that the plaintiff's claims were barred due to its failure to comply with the requirements of the act. The trial court further found in favor of the defendants on all counts of their counterclaim, awarding total damages in the amount of $145,773.44. In addition to the damages awarded, the court ordered the escrowed funds in the amount of $45,000 be distributed to the defendants. The

court denied the plaintiff's motion to open and modify the judgment. This appeal followed.

I

The plaintiff first claims that the court utilized an incorrect measure of damages in determining the amount owed to the defendants on their counterclaim. Specifically, the plaintiff argues that the court erred by awarding the defendants damages for unfinished work on the construction project, as that was money that "the owner would have to pay . . . in any event" to complete the project. According to the plaintiff, it "was required to pay for unfinished work under the judgment and for which it otherwise would have been paid . . . [and] [a]s a result it is paying twice." We are not persuaded.

The following additional facts and procedural history are relevant to our resolution of this claim. In its memorandum of decision, the trial court noted that the defendants claimed $145,773.44 in damages, "which they allegedly incurred for the repair of the plaintiff's poor workmanship and unfinished work," and stated that "[i]n assessing such damages, the court is required to determine what portion of the claim is for work which the [plaintiff] did incompetently or not at all and which portion is attributable to new work . . . which was done to complete the project. The [defendants] are not entitled to have the cost of the entire project saddled on [the plaintiff]." The court cited the testimony of Jeff Carter[3] and Jim Lively, contractors "who assessed and supervised the repairs" done to address incompetent work performed by or billed but not performed by the plaintiff, and found that the total cost of labor and materials dedicated to such repairs and completion of work was $58,876.83 for Carter and $40,839.61 for

---

[3] The memorandum of decision mistakenly refers to Carter as "Jeff Nelson."

Lively. The court specifically noted that Lively "was careful to distinguish remedial or repair work from new construction as evidenced by time sheets." Additionally, the court found that the defendants were entitled to reimbursement of $46,057 for deposits paid to the plaintiff for work that was never performed by unpaid subcontractors.

The plaintiff moved to open and modify the judgment of the court, asserting, inter alia, that the court could not have determined which portions of Carter's and Lively's bills covered work for which the defendants had paid the plaintiff. The court denied the motion.

It is well settled that "[t]he trial court has broad discretion in determining damages . . . ." *O & G Industries, Inc.* v. *All Phase Enterprises, Inc.*, 112 Conn. App. 511, 528, 963 A.2d 676 (2009). "When, however, a damages award is challenged on the basis of a question of law, our review is plenary." (Internal quotation marks omitted.) *Day* v. *Gabriele*, 101 Conn. App. 335, 346, 921 A.2d 692, cert. denied, 284 Conn. 902, 931 A.2d 262 (2007). "It is axiomatic that damages are awarded on the basis of facts and credible evidence, as found by the trier of fact. On appeal, [w]e will upset a factual determination of the trial court only if it is clearly erroneous. . . . We cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *Robert* v. *Scarlata*, 96 Conn. App. 19, 22, 899 A.2d 666 (2006).

"As a general rule, in awarding damages upon a breach of contract, the prevailing party is entitled to compensation which will place him in the same position he would have been in had the contract been properly performed. . . . For a breach of a construction contract involving defective or unfinished construction, damages are measured by computing either (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does

not involve unreasonable economic waste; or (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste." (Citations omitted; internal quotation marks omitted.) *Levesque* v. *D & M Builders, Inc.*, 170 Conn. 177, 180–81, 365 A.2d 1216 (1976).[4]

Here, the court employed a measure of damages entirely in line with the first prong of the rule articulated in *Levesque*. The court stated that the defendants alleged that they incurred damages "for the repair of the plaintiff's poor workmanship and unfinished work"; the court explicitly noted that in calculating damages, it was required to separate the claimed damages into amounts spent "for work which the [plaintiff] did incompetently or not at all" and amounts spent for "new work . . . which was done to complete the project" because the latter was not appropriately chargeable to the plaintiff. As a result, after analyzing the photographic, documentary, and testimonial evidence, the court allowed recovery only for those costs necessary to repair unacceptable work or to complete work that was billed by the plaintiff but never performed.[5] The

---

[4] The plaintiff cites *Thomas* v. *Malek Construction, LLC*, Superior Court, judicial district of New London, Docket Nos. CV-09-5011684 and CV-10-6003288 (May 8, 2012), as setting forth the appropriate calculation of damages following the approach articulated in *Levesque*. We do not read *Thomas* as requiring a different result here. Indeed, the court in *Thomas* recognized that the defendant was entitled to certain damages on its counterclaim, including "a total of [$6935 paid to subcontractors] to complete work which [the plaintiff] did not do on the home . . . [and $10,000] to complete construction of items which remain unfinished in the home." Id. The court in *Thomas* deducted these amounts, along with other damages "due [to the defendant] on her counterclaims," from the damages otherwise due to the plaintiff. Id.

[5] The plaintiff's challenge to the measure of damages also appears to incorporate a claim that the court had insufficient evidence to calculate the amount of damages fairly. It is well settled that "[t]he trial court has broad discretion in determining damages, and its decision will not be overturned

court did not, as the plaintiff asserts, award damages for the completion of new work performed to complete construction. Accordingly, we conclude that the court utilized the proper measure of damages here, and we reject the plaintiff's first claim on appeal.

## II

The plaintiff next claims that the court erred in finding defects attributable to the plaintiff because there was little or no evidence that the work found defective was performed by the plaintiff or not in accordance with the plan it contracted to follow. In general, the plaintiff argues that pursuant to the changes made to the McElroy plans, significant reframing and reworking had to be done while other projects could not be finished until the plans were finalized. The plaintiff further argues that it was doing the work substantially as drawn under the Marx plans but was not paid on its change orders in the amount of $92,974.15 at the time it was discharged. The plaintiff argues in this regard, that any evidence of "repairs" was never attributed to incompetent work performed by the plaintiff as opposed to work needed to finish the project in accordance with the new plans, for which the plaintiff was never compensated. We are not persuaded.

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *O & G Industries, Inc.* v. *All Phase Enterprises, Inc.*, supra,

unless it is clearly erroneous." *O & G Industries, Inc.* v. *All Phase Enterprises, Inc.*, supra, 112 Conn. App. 528. As discussed in further detail in part II of this opinion, we conclude that the court's damages award here was not clearly erroneous because there was sufficient evidence in the record to establish that the defects at issue were attributable to the plaintiff.

112 Conn. App. 528–29. "We cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 532. Evidence of repairs may be considered in a court's assessment of damages. See id., 529. "The repairs, however, may not result in improvements to the property, in the sense that they may not be of a different and superior type than they would have been had they been constructed as warranted. . . . The nonbreaching party . . . has a duty to minimize any damages as a result of the breach . . . [and] a nonbreaching party who attempts to mitigate [his or her] losses may recover [his or her] expenditures toward that goal from the breaching party." (Citation omitted; internal quotation marks omitted.) Id., 529–30.

After hearing evidence at trial, the court found that "the plaintiff did not have to tear out substantial portions of work it claims to have put into the house. . . . [T]here were several hundred exhibits marked into evidence, including photographs, drawings, blueprints, change orders, invoices, and receipts for goods and services dealing with the work done by [the plaintiff] pursuant to its agreement with the defendants and work done after [the plaintiff] was discharged by the defendants in May, 2007." The court referred to testimony from Carter and Lively and noted that "[t]he list of problems contained in their testimony was substantial . . . ."

The court found that the plaintiff "worked on the project for approximately nine months . . . and was paid almost $222,000 for its performance. . . . A considerable amount of the work was either done in a shoddy and unprofessional manner or not at all." In

referring to the defendants' counterclaim, the court found the amounts claimed to have been "expended by the [defendants] to repair the unacceptable work performed by the [plaintiff] or to complete the work never performed . . . yet billed for [by the plaintiff]." The court reiterated that it "had the benefit of an extraordinary number of photographs and illustrations which corroborate the [defendants'] claim as to how much work claimed by the [plaintiff] was not done and the lack of quality of that which was done."

After reviewing the record, we find sufficient evidence to support the court's award of damages. At the outset, Connery testified that the plaintiff failed to secure the house properly as it was being renovated. In particular, Connery testified that a storm in December, 2006, caused a tarp to cave in, which caused water to enter the house, damaging wood floors and destroying the basement water management system, including the sump pump.

Marx, the architect hired in January, 2007, and Jones, the structural engineer hired to review the project in March, 2007, testified as experts about a number of problems they discovered after their respective examinations of the project. Marx testified, inter alia, that he observed in January, 2007, that the plaintiff failed to manage the site properly, store materials, sequence construction and supervise subcontractors. Marx further testified about problems with the installation of windows and doors and inadequate flashing. Marx also testified that the plaintiff failed to adhere to the McElroy drawings, comprehend the project and what was required in order to proceed, and comply with industry standards, codes and regulations. Finally, Marx testified that the plaintiff violated the defendants' trust by billing for nearly 80 percent of the contract when substantially more than 20 percent of the work remained to be done.

Jones testified, inter alia, that the plaintiff failed to provide services in a workmanlike manner and, in general, fell below the standard of care for construction of a residence with respect to site supervision, construction, skilled labor and workmanship. Jones further testified that he noticed a number of similar concerns, as did Marx, with respect to the windows and the patio. Most importantly, Jones testified with respect to a number of structural problems with the project due to, among other things, the 110 mile per hour wind load requirement for houses in Milford, including the following: The framing of an attic floor was overstressed as well as a first floor interior bearing wall. In a corner of the house, one foot blocks of wood were added to existing studs to increase the first floor ceiling height, which could cause buckling and subject the house to partial collapse from high winds. A girder in the basement had multiple splices and was overstressed. The first floor bearing wall was not located directly over the girder in the basement and was also located in between the joists on the first floor. The exterior gable end wall of the garage was not made with continuous studs, which could lead to buckling. Finally, rafters and joists in the attic were not properly tied due to improper spacing.

Subsequently, Marx and Jones submitted changes to the project. Marx testified that a vast majority of the changes did not require the plaintiff to redo any work previously performed and that, again, the plaintiff violated the defendants' trust by tripling the cost of the work after plans were changed because the footprint and size of the house was never changed, nor were the materials to be utilized except for cedar shingles in place of stone veneer. Jones testified that, in March, 2007, he produced some drawings and sketches to address the structural problems but that, after the plaintiff was discharged, he noticed that much of the work

had not been done and some of the work that had been done was done improperly.

Carter testified that he initially was hired as a consultant on the project until he was hired to take over for the plaintiff after it was discharged. Carter testified generally to a number of structural repairs, including installation of solid blocking in the floor joists for lateral support, completion of the tide truss system for the rafters in the attic, installation of steel strapping in the attic and throughout the second floor, packing of the frame on the rear wall in order to support the second and third floors, packing of a stair wall in order to level it, installation of steel connectors throughout the entire house to tie separate framing members together, installation of lally columns in the basement to provide support for the beams and vertical loading of the floors, and connection of the first floor to the foundation.

Carter further testified to the following. Various other framing was not laid out to plan and had to be reworked and completed. Window clips were not installed to the framing on a number of windows and a number of windows had to be removed in order to install the exterior extension jams. Sill pans for the doors, which channel water away from the interior of the house, were not installed and needed to be pursuant to manufacturing specifications. Tyvek wrapping had to be reinstalled around the entire house because the Tyvek previously installed was cut and tattered. Blue stone had to be removed and then replaced on the front porch because flashing was not properly installed to prevent water from running up against the house. Another layer of stucco had to be applied to the front porch walls. Soffits needed to be completed on the main roof. Finally, installation of temporary electrical service was required because a temporary electrical pole had not been installed correctly. Carter also testified that the defendants were charged for cedar trim when pine was used

instead. Carter continuously distinguished these "repairs" from "new work."

Lively testified that he replaced Carter on the project. He testified to the following. The framing of a staircase was not square such that the staircase needed to be removed, along with the supporting wall, in order to support the staircase, straighten it out, take the dips out of it and square it at the top with the landing. A support wall was not supported by the foundation and buckled out an inch and one-half wherein the window had to be removed along with shingles, trim and Sheetrock, the wall anchored into place and the window and other materials reinstalled. A basement water management system had to be repaired because it was clogged while the sump pump was damaged due to construction debris and water. There were a number of issues with the floors that needed to be leveled and/or repaired. The soffits and the trim on the outside needed to be repaired because they were not properly installed, thereby creating gaps and exposing plywood to the weather. The roof needed to be repaired and flashing installed to prevent trim and plywood from rot. The second floor bathroom needed to be leveled and a window removed and reinstalled. The roof needed to be repaired and drywall replaced due to an incorrectly installed vent pipe that was causing water damage. A header needed to be installed around a back door. The front walkway had to be relocated and reinstalled. Furthermore, foundation had to be installed under one wall, which was hanging off the edge of the foundation previously installed. Lively distinguished these "repairs" from "new work."

The plaintiff seems to argue that by January, 2007, it was substantially finished with the project and that the "repairs" were in fact "new work" instituted by Marx and Jones, for which the plaintiff was not compensated. Even to the extent that there was any evidence of this

in the record, the court was free to credit the preceding testimony and rely upon the relevant documents and photographs to find that a substantial portion of the work had not been completed by the plaintiff when the plan was revised even though nearly 80 percent of the project had been billed, that incompetent work had been rendered up to that point in a number of respects, that the plaintiff failed to perform much of the revised plan or, likewise, performed in an incompetent manner, and that the cost of repairs for this incompetent work totaled, under Carter $58,876.83,[6] and under Lively

---

[6] The plaintiff also claims that the court improperly relied on Carter's opinion as to defects and damages, asserting that Carter was called to testify as a fact witness, and that the court told the parties that it was treating him as a fact witness only. We are not persuaded by this assertion. As a preliminary matter, it is not clear from either the record or the memorandum of decision that the court treated Carter as an expert witness. During Carter's testimony, when the plaintiff's counsel originally objected to the presentation of Carter as an expert witness, the court indicated that it was treating Carter as a fact witness only and invited the plaintiff's counsel, going forward, to raise objections to each question if he desired. Carter then testified regarding, inter alia, his knowledge of various repairs performed under his supervision and cost breakdowns for these repairs—facts and observations to which he could testify in his capacity as a lay witness. See, e.g., *Kronovitter* v. *Doyle*, 135 Conn. App. 157, 165, 41 A.3d 1108 (2012) (witness not testifying as expert where, even though witness likely had special knowledge and experience in subject matter, that knowledge and experience not required for testimony consisting of factual statements and observations); *Sanzo's Appeal from Probate*, 133 Conn. App. 42, 47–48, 35 A.3d 302 (2012) (lay witness testimony regarding personal observations is not improper "opinion" testimony). Notably, throughout Carter's testimony, the plaintiff's counsel did not object to any further questions as calling for expert opinion, and the memorandum of decision never indicated that the court was relying on Carter's testimony as expert opinion.

Moreover, to the extent that the plaintiff asserts that expert testimony was required to support the defendants' claimed damages of $58,876.83 for construction projects performed under Carter's supervision, the court had before it both "an extraordinary number of photographs and illustrations" demonstrating the defective nature of the work, as well as the testimony of numerous witnesses—including expert testimony—regarding the defects and necessary repair work. Given the obvious nature of the defects and the comprehensive testimony detailing the necessary repairs, we cannot conclude that the court erred in awarding damages for this work. See, e.g., C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 7.5.4 (a), p.

$40,839.61.[7] We, therefore, conclude that the court's findings were not clearly erroneous because there was sufficient evidence in the record to establish that the defects at issue were attributable to the plaintiff.

### III

The plaintiff's final claim challenges the sufficiency of the evidence as to whether it was a contractor for the purposes of the act, § 20-418 et seq. The defendants argue that we should decline to review this claim because it was not decided by the trial court. We agree that this claim was not decided by the trial court and, therefore, we decline to afford it review.

The following additional facts are relevant to this claim. The plaintiff did not assert that it was not a contractor under the act until the final day of trial when it sought to amend its reply to the defendants' special defenses to include such a claim. Due to the untimeliness of the plaintiff's request for leave to amend, the court denied it, stating: "I think at this time on the [eleventh] day of trial, after both sides have rested, and the evidence and testimony is in, the court is going to deny the request to amend [the response to] the special defense. It's the first time it's been presented to the

411 (even where expert testimony is otherwise required in cases involving professional malpractice, such testimony may be excused "in those cases in which the professional negligence is so gross as to be clear even to a layperson").

[7] Along these same lines, the plaintiff also claims that, even to the extent that the damages constitute "repairs" and not "new work," there is no evidence that attributes these expenses to the plaintiff's work because there is no evidence as to whether the repairs related to work done by the plaintiff, work done by Carter or preexisting construction, or whether work done by the plaintiff deviated from established plans. Much of the repairs cited by Lively expressly relate to items in the contract that were the responsibility of the plaintiff or related to damage to the project due to improper management. On the basis of Marx' and Jones' testimony, the court reasonably could infer that the plaintiff performed incompetent work under the contract and that the expenses billed by Lively were a direct consequence of that incompetent work.

court, and I just think it would be unfair and inappropriate, so the court is not going to allow the amendment."

On appeal, the plaintiff has neither challenged the trial court's denial of its request to amend, nor provided any explanation as to why, despite the trial court's rejection of the proposed amendment, this court should examine whether the plaintiff was a contractor under the act. See *Marlborough* v. *AFSCME, Council 4, Local 818-052*, 130 Conn. App. 556, 564, 23 A.3d 798 (2011) ("The theory upon which a case is tried in the trial court cannot be changed on review, and an issue not presented to or considered by the trial court cannot be raised for the first time on review. Moreover, an appellate court should not consider different theories or new questions if proof might have been offered to refute or overcome them had they been presented at trial." [Internal quotation marks omitted.]), rev'd on other grounds, 309 Conn. 790, 75 A.3d 15 (2013). Consequently, we decline to review this claim.

The judgment is affirmed.

In this opinion the other judges concurred.